# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| CARLA COLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:21-cv-00548-NAD |
| | ) | |
| SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | |
| COMMISSIONER, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER
## AFFIRMING THE DECISION OF THE COMMISSIONER

Pursuant to 42 U.S.C. § 405(g), Plaintiff Carla Coley filed for review of an adverse, final decision of the Commissioner of the Social Security Administration ("Commissioner") on her claim for disability benefits.  Doc. 1.  Plaintiff Coley applied for disability benefits with an alleged onset date of March 13, 2017.  Doc. 10-5 at 19–20, 35; Doc. 10-8 at 2, 16.  The Commissioner denied Coley's claim for benefits.  Doc. 10-5 at 36–49.

Pursuant to 28 U.S.C. § 636(c)(1) and Federal Rule of Civil Procedure 73, the parties consented to magistrate judge jurisdiction.  Doc. 11.  After careful consideration of the parties' submissions, the relevant law, and the record as a whole, the court **AFFIRMS** the Commissioner's decision.

## ISSUES FOR REVIEW

In this appeal, Plaintiff Coley argues that the court should reverse the Commissioner's decision for four reasons:  (1) the Administrative Law Judge (ALJ) failed to give Plaintiff Coley's obesity proper consideration pursuant to Social Security Rulings (SSR) 02-1p or 19-2p; (2) The ALJ failed to conduct a proper evaluation of Coley's fibromyalgia under SSR 12-2p; (3) the ALJ failed to accord proper weight to the opinions of Dr. June Nichols, an examining psychologist; and (4) the ALJ's decision was not supported by substantial evidence because the ALJ failed to pose hypothetical questions to the vocational expert that adequately described Coley's conditions and limitations.  Doc. 13; Doc. 15.

## STATUTORY AND REGULATORY FRAMEWORK

A claimant applying for Social Security benefits bears the burden of proving disability.  *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).  To qualify for disability benefits, a claimant must show the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrated

by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

The Social Security Administration (SSA) reviews an application for disability benefits in three stages:    (1) initial determination, including reconsideration; (2) review by an ALJ; and (3) review by the SSA Appeals Council. *See* 20 C.F.R. § 404.900(a)(1)–(4).

When a claim for disability benefits reaches an ALJ as part of the administrative process, the ALJ follows a five-step sequential analysis to determine whether the claimant is disabled.  The ALJ must determine the following:

(1)    whether the claimant is engaged in substantial gainful activity;

(2)    if not, whether the claimant has a severe impairment or combination of impairments;

(3)    if so, whether that impairment or combination of impairments meets or equals any "Listing of Impairments" in the Social Security regulations;

(4)    if not, whether the claimant can perform his past relevant work in light of his "residual functional capacity" or "RFC"; and

(5)    if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy.

20 C.F.R. § 416.920(a)(4); *see Winschel v. Commissioner of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011).

The Social Security regulations "place a very heavy burden on the claimant to demonstrate both a qualifying disability and an inability to perform past relevant

3

work." *Moore*, 405 F.3d at 1211.  At step five of the inquiry, the burden temporarily shifts to the Commissioner "to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform." *Washington v. Commissioner of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018) (quoting *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)).  If the Commissioner makes that showing, the burden then shifts back to the claimant to show that he cannot perform those jobs.  *Id.*  So, while the burden temporarily shifts to the Commissioner at step five, the overall burden of proving disability always remains on the claimant.  *Id.*

## STANDARD OF REVIEW

The federal courts have only a limited role in reviewing a plaintiff's claim under the Social Security Act.  The court reviews the Commissioner's decision to determine whether "it is supported by substantial evidence and based upon proper legal standards." *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997).

**A.**    With respect to fact issues, pursuant to 42 U.S.C. § 405(g), the Commissioner's "factual findings are conclusive if supported by 'substantial evidence.'"  *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Commissioner of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).

4

In evaluating whether substantial evidence supports the Commissioner's decision, a district court may not "decide the facts anew, reweigh the evidence," or substitute its own judgment for that of the Commissioner. *Winschel*, 631 F.3d at 1178 (citation and quotation marks omitted); *see Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) (similar). If the ALJ's decision is supported by substantial evidence, the court must affirm, "[e]ven if the evidence preponderates against the Commissioner's findings." *Crawford*, 363 F.3d at 1158 (quoting *Martin*, 894 F.2d at 1529).

But "[t]his does not relieve the court of its responsibility to scrutinize the record in its entirety to ascertain whether substantial evidence supports each essential administrative finding." *Walden*, 672 F.2d at 838 (citing *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980)); *see Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

**B.** With respect to legal issues, "[n]o . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999.

## BACKGROUND

### A.   Plaintiff Coley's personal and medical history

Plaintiff Coley was born on August 24, 1981. Doc. 10-5 at 19. She was 35 years old when she applied for the disability benefits at issue in this case. Doc. 10-

5 at 19.

From February 2012 through October 2012, Coley received care at Quality of Life Health Services.  Doc. 10-11 at 7.  Coley consistently presented with back pain, epilepsy, depression, fibromyalgia, gastrointestinal complaints, and headaches, and maintained a body mass index (BMI) around 60, which classified her as obese.  Doc. 10-11 at 11–53.  Coley's back pain was diagnosed as lumbago, and imaging identified a questionable L5 defect.  Doc. 10-11 at 43.

In 2014, Coley suffered a rotator cuff sprain to her right shoulder causing shoulder pain; an x-ray showed no bony injury.  Doc. 10-15 at 95–103.

Coley returned to Quality of Life for care from June 2015 through March 2017, reporting back pain, anxiety, depression, obesity, hypertension, and seizures. Doc. 10-11 at 57–108.  In March 2017, Coley received a refill of her Klonopin prescription because of increased anxiety.  Doc. 10-11 at 103.  Coley's BMI at that point was 63.92.  Doc. 10-11 at 107.

On March 15, 2017, Coley filled out a disability report.  Doc. 10-9 at 6.  Coley reported that back problems, fibromyalgia, depression, anxiety, prediabetes, high blood pressure, and seizures limited her ability to work.  Doc. 10-9 at 7.  She stated that she last had worked in 2009 and stopped working "because of [her] condition(s)."  Doc. 10-9 at 7.  Coley stated that she was taking medication, including Celexa for depression, Dilantin for seizures, Flexeril for her back, HCTZ

and Lisinopril for blood pressure, Klonopin for anxiety, and Neurontin for pain. Doc. 10-9 at 10.

On April 4, 2017, Coley filled out a disability services questionnaire regarding her seizures. Doc. 10-9 at 16. She reported that she frequently had seizures in which she bit her tongue, twitched, and kicked, but did not have incontinence, and that the seizures happened when she was asleep. Doc. 10-9 at 16. Coley also filled out a function report, in which she stated that she lived with her boyfriend, and that her daily routine generally consisted of getting him up for work, lying back down, then either watching television or doing light cleaning, preparing for dinner, cooking dinner, and washing dishes—though she had to sit down to do most of the chores. Doc. 10-9 at 28–31. Coley stated that she had anxiety and did not do well around people she did not know. Doc. 10-9 at 31. She stated that she did not drive because she did not have a vehicle. Doc. 10-9 at 31. She stated that she could shop for groceries but did not do so often, and that it usually took her 2 to 3 hours. Doc. 10-9 at 31.

On May 3, 2017, Dr. June Nichols conducted a mental health examination in connection with Coley's disability proceedings. Doc. 10-11 at 3. Dr. Nichols took a detailed history of Coley's anxiety and depression. Doc. 10-11 at 3–4. Dr. Nichols noted that Coley appeared neat and clean and had normal speech, but had a sad and tearful affect without suicidal or homicidal ideation. Doc. 10-11 at 4. Dr. Nichols

found that Coley had adequate mental processing, grossly intact memory, an adequate fund of information, normal thought processes, good judgment and insight, and average intellectual ability. Doc. 10-11 at 5. Dr. Nichols noted that Coley was positive for auditory hallucinations because she reported hearing people talking when she closed her eyes, and that she was positive for panic attacks. Doc. 10-11 at 5. Dr. Nichols also noted that Coley cleaned house and cooked. Doc. 10-11 at 5.

Dr. Nichols diagnosed Coley with major depressive disorder recurrent, severe, with psychotic symptoms and panic disorder. Doc. 10-11 at 5–6. Dr. Nichols noted that Coley was cooperative throughout the session and that her prognosis would be good with medication and therapy. Doc. 10-11 at 6. Dr. Nichols opined that Coley's "ability to respond to supervision, to coworkers, and to work pressures in a work setting would be impaired." Doc. 10-11 at 6. Dr. Nichols also stated that Coley's depression and anxiety would "interfere" with her ability to remember, understand, and carry out instructions because they would "interfere" with her ability to sustain concentration and attention, despite her lack of evident deficits in function. Doc. 10-11 at 6. Dr. Nichols noted that Coley could handle her own funds and live independently without support. Doc. 10-11 at 6.

On May 6, 2017, Coley had a consultative exam with Dr. Sathyan Iyer in connection with her disability proceedings. Doc. 10-11 at 110. Dr. Iyer noted that Coley had a chronic "lower back problem" that prevented her from standing for long,

walking very far, or bending, but noted that Coley had not had an MRI and had taken Flexeril for the problem. Doc. 10-11 at 111. Dr. Iyer also noted that Coley reported fibromyalgia that had been diagnosed 10 years before, anxiety/depression and panic disorder, and seizures during sleep—for which she never had seen a neurologist. Doc. 10-11 at 111. Dr. Iyer noted that Coley had migraine headaches, a tendency to have diarrhea, and high blood pressure. Doc. 10-11 at 111. Dr. Iyer stated that Coley was significantly overweight, could stand up without assistance, had normal gait with no assistive device, but could not walk on her toes, walk on her heels, or squat, and tended to get short of breath with activity. Doc. 10-11 at 112. Dr. Iyer observed that Coley had full range of motion with no restriction, normal strength and muscle tone, and normal grip. Doc. 10-11 at 113. Dr. Iyer opined that Coley would have impairment in functions involving "standing for long periods, bending, lifting, overhead activities, climbing, working at heights, working around moving machinery," lifting weights, and—depending on her seizure disorder—driving. Doc. 10-11 at 113. Dr. Iyer stated that Coley "does not have limitation of functions involving sitting, standing, handling, hearing, or speaking." Doc. 10-11 at 113.

On June 26, 2017, Coley presented to Quality of Life for her fibromyalgia. Doc. 10-15 at 173. The severity of Coley's fibromyalgia was at a level 10, with generalized aches and pain aggravated by movement with no relieving factors. Doc. 10-15 at 173. Her symptoms included joint tenderness, limping, numbness, spasms,

swelling, and tenderness.  Doc. 10-15 at 173.  Coley was prescribed Lyrica for her fibromyalgia.  Doc. 10-15 at 177.

On June 28, 2017, Coley had an x-ray of her lower spine for back pain, and the x-ray returned no acute findings.  Doc. 10-15 at 61.

On August 29, 2017, Coley went to CED Mental Health Center for an intake exam.  Doc. 10-14 at 92.  Coley had an appropriate appearance and normal affect and orientation, but her mood was dysphoric and tearful.  Doc. 10-14 at 92.  Coley reported a history of anxiety and depression.  Doc. 10-14 at 92.  Coley reported a previous suicide attempt three years prior.  Doc. 10-14 at 99.  Coley was diagnosed with depression, anxiety, and panic disorder.  Doc. 10-14 at 99.

On September 25, 2017, Coley had an x-ray of her lumbar spine for lower back pain; the results were unremarkable and showed preserved disc spaces, no fracture, no subluxation, and no dislocation.  Doc. 10-15 at 47.  At that time, Coley reported that she had stopped taking her seizure medication because she could not afford it and had not had more seizures.  Doc. 10-15 at 53.

On September 29, 2018, Coley reported to Gadsden Regional Medical Center Emergency Department with moderate low back pain with an intensity of 5 out of 10.  Doc. 10-15 at 12.  She was diagnosed with a muscle strain.  Doc. 10-15 at 12.  Coley's chart noted that she suffered from migraines, fibromyalgia, obesity, and seizures.  Doc. 10-15 at 13.

On January 3, 2019, Coley reported to the Gadsden Regional Medical Center Emergency Department with back and knee pain after a fall down the stairs. Doc. 10-15 at 155. Imaging found no acute fractures or dislocation in her extremities. Doc. 10-15 at 163–165. Coley also had an x-ray of her spine that identified no acute fracture or dislocation and no significant spondyloarthropathy. Doc. 10-15 at 167.

On August 9, 2019, Dr. Nichols performed a second psychological evaluation of Coley related to her disability proceedings. Doc. 10-16 at 2. Dr. Nichols took a detailed history from Coley, in which Coley stated that she had a long history of depression over the course of her life, that she had "lost every job because of [her] temper and attitude," and that she had panic attacks around people. Doc. 10-16 at 2–4. Dr. Nichols described Coley as "slightly disheveled." Doc. 10-16 at 5. Coley's speech and thought process were normal but her affect was sad, tearful, and angry. Doc. 10-16 at 5. Dr. Nichols stated that Coley's stream of consciousness was clear, she was well oriented, and she had no evidence of confusion, but Coley did report auditory hallucinations. Doc. 10-16 at 5. Coley reported that she was uncomfortable in crowds and suffered from anxiety, but denied panic attacks. Doc. 10-16 at 5.

Dr. Nichols stated that Coley's judgment and insight were good and she was of average intellectual ability. Doc. 10-16 at 5. Dr. Nichols observed Coley's speed of mental processing to be adequate, her memory function to be grossly intact, her general fund of knowledge to be adequate, and her thinking to be normal. Doc. 10-

16 at 5.  Coley reported to Dr. Nichols that most days she fixed lunch for her boyfriend, washed dishes, watched a movie, played on her phone, and slept, and that she "take[s] care of everything at home except take out the trash, sweep and mop." Doc. 10-16 at 5.  Dr. Nichols noted that Coley could manage basic self-care, and could understand, carry out, and remember short and simple instructions, but was "likely unable" to maintain attention and concentration for 2 or more hours, was "unable" to maintain a regular schedule with appropriate punctuality, was "unable" to avoid being absent more than 1-2 days per month due to "issues," was "unable" to sustain an ordinary work routine without supervision, was "unable" to seek and accept instructions or criticism from supervisors, and was "likely unable" to maintain socially appropriate appearance, behavior, and interactions in the workplace.  Doc. 10-16 at 6.  Dr. Nichols noted that Coley could manage finances reliably and independently.  Doc. 10-16 at 6.  Dr. Nichols diagnosed Coley with major depressive disorder, recurrent, severe, with psychotic features and generalized anxiety disorder.  Doc. 10-16 at 6.

On August 21, 2019, Dr. Nichols filled out a mental health source statement for Coley related to her disability proceedings.  Doc. 10-16 at 8.  Dr. Nichols opined that Coley could understand, remember, and carry out simple instructions, but could not maintain attention and concentration for at least 2 hours, perform activities within a schedule and be punctual, sustain an ordinary routine without special

supervision, adjust to routine and infrequent work changes, interact with supervisors and/or coworkers, or maintain socially appropriate behavior.  Doc. 10-16 at 8.  Dr. Nichols stated without explanation that Coley would be off task 25% to 30% of the workday and would miss 5 to 6 days of work per 30-day period.  Doc. 10-16 at 8.

From late 2019 to 2020, Coley presented to St. Michael's Community Service Medical Center with a BMI in the 60s and was prescribed medication for diagnoses including hypothyroidism, arthritis, type 2 diabetes, hypertension, seizure disorder, fibromyalgia, and diabetic neuropathy.  Doc. 10-16 at 112–121.

### B.     Social Security proceedings

#### 1.     Previous denial of benefits

Before Coley applied for the disability benefits at issue in this case, Coley filed an application for disability benefits in 2011, which was denied by an ALJ in 2013.  Doc. 10-5 at 2–14.

#### 2.     Initial application and denial of benefits

In March 2017, Coley filed an application for Supplemental Security Income (SSI) benefits, alleging an onset date of February 12, 2013.[1]  Doc. 10-5 at 19–20, 35; Doc. 10-8 at 2.   Coley alleged that she suffered from back problems, fibromyalgia, depression, anxiety, prediabetes, high blood pressure, and seizures.

---

[1] Coley later amended the alleged onset date to March 13, 2017, the date that she filed her application.  Doc. 10-8 at 16.

Doc. 10-5 at 19–20.  At the time that she filed her application, Coley had a BMI of 63.9.  Doc. 10-5 at 19.

In June 2017, Coley's disability claim was initially denied based on a finding that, in light of the evidence presented, Coley was not disabled under the Social Security Act.  Doc. 10-5 at 22–35.  Dr. Samuel Williams and Dr. Richard Walker, non-examining state agency physicians, opined that Coley was moderately restricted and could perform work at a medium level.  Doc. 10-5 at 25–32.

On June 12, 2017, Coley filed a request for a hearing before an ALJ.  Doc. 10-5 at 39; Doc. 10-6 at 9.

### 3.      February 2019 ALJ hearing

An ALJ conducted a video hearing on February 19, 2019.  Doc. 10-4 at 33–35.  At the hearing, Coley testified that she lived with her boyfriend, had a driver's license but rarely drove, had not worked since waitressing at Waffle House in 2007 or 2009, and had not applied for jobs since then because she could not sit or stand long enough to work and because she was prevented from working by lower back pain, depression, and anxiety.  Doc. 10-4 at 40–43.  She testified that her back pain was usually at an intensity of about 8 out of 10, required her to take prescription muscle relaxers, and limited her ability to walk and stand.  Doc. 10-4 at 43–44.

Coley testified that she also suffered from joint pain, fibromyalgia that she treated with Lyrica or Neurontin, depression, and anxiety.  Doc. 10-4 at 44–53.

14

Coley testified that most days she did not get dressed or leave her house, and she did not leave the house without her boyfriend.  Doc. 10-4 at 54.  Coley stated that she could do chores like cook and wash dishes, but only if she was able to sit.  Doc. 10-4 at 54–55.  Coley stated that she left her job at Waffle House because her "attitude and [her] temper got out of hand."  Doc. 10-4 at 57–58.

Coley stated that she spent most of her time lying down and had trouble sitting in a normal chair without padding for more than 5 minutes.  Doc. 10-4 at 58–59.  Coley testified that she had seizures, but generally only when she slept, and had daily migraines that usually lasted for 2 to 3 hours.  Doc. 10-4 at 60–61.  Coley stated that at night she often felt like she was hearing things.  Doc. 10-4 at 61–62.

### 4.    May 2019 ALJ decision

On May 17, 2019, an ALJ entered an unfavorable decision finding that Coley was not disabled.  Doc. 10-5 at 36–49.  The ALJ found that Coley had "not been under a disability within the meaning of the Social Security Act since March 13, 2017, the date the application was filed."  Doc. 10-5 at 40, 49.  In the decision, the ALJ considered the record and applied the five-part sequential test for disability (*see* 20 C.F.R. § 416.920(a); *Winschel*, 631 F.3d at 1178), then found that Coley had the following severe impairments:  disorders of the back (discogenic and degenerative), obesity, depressive, bipolar, and related disorders, and anxiety and obsessive-compulsive disorders.  Doc. 10-5 at 41.  However, the ALJ found that Coley had a

residual functional capacity (RFC) that allowed for light work with some limitations, and consequently that Coley was able to perform jobs that existed in significant numbers in the national economy.  Doc. 10-5 at 41–49.

In the decision, the ALJ did not specifically address Coley's alleged fibromyalgia or its effects or severity.  *See* Doc. 10-5 at 39–49.  The ALJ also did not address the opinions of Dr. June Nichols.  Doc. 10-5 at 39–49.

### 5.    April 2020 Appeals Council remand

On April 21, 2020, the SSA Appeals Council remanded Coley's case to the ALJ for further consideration.  Doc. 10-5 at 55–59.  The Appeals Council stated that the ALJ's decision did not address the opinions of Dr. June Nichols, which required evaluation.  Doc. 10-5 at 57.  The Appeals Council also stated that further consideration was needed to determine the severity of Coley's fibromyalgia.  Doc. 10-5 at 58.

### 6.    August 2020 ALJ hearing

On August 27, 2020, a different ALJ conducted a (telephonic) second hearing on Coley's application for disability benefits.  Doc. 10-4 at 72–75.  Coley testified that she could not stand, lift, bend, or squat due to pain in her lower back and pain and swelling in her knees and feet.  Doc. 10-4 at 79–80.  Coley stated that she had never had physical therapy and took Gabapentin for both her fibromyalgia and for back pain, but that it does "not really" help and puts her to sleep.  Doc. 10-4 at 80–

16

81.  Coley stated that she took Celexa and Flexeril for her depression and anxiety, though she took Klonopin when she had access to it.  Doc. 10-4 at 82.

Coley testified that she was 5'6", weighed 402 pounds, and was diabetic.  Doc. 10-4 at 82.  Coley stated that her doctor had told her to exercise, preferably in a pool, because walking and other exercise could be "strenuous" on her joints.  Doc. 10-4 at 83.  Coley testified that she was diagnosed with fibromyalgia in 2010.  Doc. 10-4 at 84.  Coley stated that she did not receive psychiatric treatment because she could not afford it, and only saw Dr. Nichols for consultative evaluations related to her disability proceedings.  Doc. 10-4 at 84.

Coley testified that her back pain was her biggest impediment to working because she could only sit for a few minutes before she had to get up and walk around.  Doc. 10-4 at 85.  Coley testified that she did "all of the household functions," except that her boyfriend took care of the trash, sweeping, and mopping.  Doc. 10-4 at 85.  She stated that she could sit down to wash dishes, cook, and clean laundry without lifting her right arm.  Doc. 10-4 at 86.  Coley stated that she was having trouble with her right shoulder and could not lift anything with that arm.  Doc. 10-4 at 86.

Coley testified in response to questioning from counsel that she did not do well interacting with strangers because being around strangers caused anxiety and panic attacks.  Doc. 10-4 at 86.  She also testified that she could not go into a store

to buy a snack because she could not stand up long enough.  Doc. 10-4 at 87.  She stated that she can only sit in cushioned chairs.  Doc. 10-4 at 87.  Coley stated that she could sit for about 30 to 45 minutes to wash the dishes.  Doc. 10-4 at 88.  Coley stated that she could only stand still for about 5 minutes and could lift a gallon of milk with her left arm but not her right.  Doc. 10-4 at 88.

Coley stated that her insulin for her diabetes made her nauseated, but the nausea medicine that she was prescribed made her sleepy.  Doc. 10-4 at 88.  She also stated that her diabetes caused her to urinate frequently and caused diarrhea.  Doc. 10-4 at 90.  Coley repeated that her Gabapentin made her sleepy.  Doc. 10-4 at 89.  Coley stated that she typically spent about 5 hours of a normal day lying down or sleeping.  Doc. 10-4 at 89–90.  Coley testified that she still suffered from seizures and that they caused her to chew her tongue, caused her eyes to roll back in her head, and sometimes caused urinary incontinence.  Doc. 10-4 at 91.  She testified that she was on the medication Keppra for her seizures, but that she still had seizures 3 times per week.  Doc. 10-4 at 92.  Coley testified that she did not drive, and that she did not dress or bathe about 75% of the time and, recently, up to about 90% of the time because her anxiety, stress, and depression had increased.  Doc. 10-4 at 92.  Coley stated that she had panic attacks every time she left the house.  Doc. 10-4 at 92–93.  Coley testified that she also suffered from frequent migraines and polycystic ovarian syndrome that caused abdominal pain.  Doc. 10-4 at 93–95.

18

A vocational expert (or "VE"), Brenda Dumas, testified that a hypothetical individual with Coley's age and education, with no work experience, and with Coley's limitations could perform jobs that existed in significant numbers in the national economy, including final assembler, folder, and table worker.  Doc. 10-4 at 99–101.   Dumas testified that those jobs required reaching, but not overhead reaching.   Doc. 10-4 at 101.   She also confirmed that those jobs would allow someone to change position between sitting and standing every 45 minutes for 1 to 3 minutes if the person remained on task.  Doc. 10-4 at 102.  She testified that being off task more than 10% of the workday, being absent more than 1 day per month, being "unable to interact with coworkers or supervisors," or being unable to maintain concentration, persistence, or pace for 2 hours or longer would preclude employment.   Doc. 10-4 at 102–103.   Additionally, needing to lie down for more than 5 hours per day, being unable to sit for 6 hours per day, and being unable to bilaterally handle things more than occasionally would preclude employment.  Doc. 10-4 at 103.

### 7.    October 2020 ALJ decision

On October 5, 2020, the ALJ entered an unfavorable decision.  Doc. 10-3 at 46–59.   The ALJ found that Coley had "not been under a disability within the meaning of the Social Security Act since March 13, 2017, the date the application was filed."  Doc. 11-3 at 47, 59.  The ALJ noted that Coley initially had alleged an

onset date of February 21, 2013, but amended the onset date to March 13, 2017, during the hearing.  Doc. 11-3 at 46.

In the decision, the ALJ applied the five-part sequential test for disability (*see* 20 C.F.R. §416.920(a); *Winschel*, 631 F.3d at 1178).  At step one, the ALJ found that Coley had not engaged in substantial gainful activity since March 13, 2017, the date of her application for disability benefits.  Doc. 10-3 at 48.  At step two, the ALJ found that Coley had the following severe impairments:  "degenerative disc disease, obesity, depression, anxiety, fibromyalgia, and diabetes mellitus."  Doc. 10-3 at 48.  The ALJ also found that Coley had numerous nonsevere impairments, including "hypertension, hyperlipidemia, autoimmune thyroiditis, degenerative joint disease of the left knee, osteoarthritis of the right knee, degenerative joint disease of the left foot, headaches, vertigo, polycystic ovary syndrome (PCOS), seizure disorder, and neuropathy."  Doc. 10-3 at 49.  But the ALJ found that Coley had "not demonstrated any ongoing or continuous restrictions due to" those nonsevere impairments.  Doc. 10-3 at 49.

At step three, the ALJ found that Coley did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the applicable Social Security regulations.  Doc. 10-3 at 49–50.  In making that finding, the ALJ considered the severity of Coley's mental impairments and found that Coley had only moderate limitations in

(1) understanding, remembering, or applying information, (2) interacting with others, (3) concentrating, persisting, or maintaining pace, and (4) adapting and managing oneself.  Doc. 10-3 at 49–50.

At step four, the ALJ determined Coley's RFC, finding that Coley had the capacity to "perform work at the sedentary exertional level" with the additional limitations that she could occasionally climb ramps and stairs, could occasionally stoop and crouch, should never climb ladders, ropes, or scaffolds, should never kneel or crawl, could occasionally reach overhead to the right, could have only occasional exposure to extreme conditions, and could have no exposure to unprotected heights or dangerous machinery.  Doc. 10-3 at 51.  The ALJ also found that Coley could "understand, remember, and carry out simple instructions and tasks," could "tolerate changes in the workplace that are infrequent and gradually introduced," and could "have occasional work-related interaction with supervisors, co-workers and the general public."  Doc. 10-3 at 51.

The ALJ considered all of Coley's symptoms and the extent to which they reasonably could be accepted as consistent with the evidence, in accordance with the requirements of 20 C.F.R. § 416.929 and SSR 16-3p.  Doc. 10-3 at 51.

In assessing Coley's RFC and the extent to which Coley's symptoms limited her functioning, the ALJ stated that the ALJ "must follow" the required "two-step process":  (1) "determine[] whether there is an underlying medically determinable

physical or mental impairment[] . . . that could reasonably be expected to produce the claimant's pain or other symptoms"; and (2) "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functional limitations."  Doc. 10-3 at 51.

The ALJ stated that Coley initially had alleged that she was disabled by back problems, fibromyalgia, depression, anxiety, prediabetes, high blood pressure, and seizures.  Doc. 10-3 at 52.  The ALJ then provided a thorough summary of Coley's testimony about her limitations.  Doc. 10-3 at 52.

"[A]fter careful consideration of the evidence," the ALJ found that Coley's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms," but that Coley's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision."  Doc. 10-3 at 52.  The ALJ then provided an exhaustive summary of Coley's medical records.  Doc. 10-3 at 52–54.  The ALJ found, under SSR 12-2p, that Coley's evidence was "sufficiently consistent" with the "criteria for fibromyalgia."  Doc. 10-3 at 53.  The ALJ also found, according to SSR 19-2p, that Coley's obesity in combination with her other impairments "significantly reduces [her] ability to perform work activities" such that her combination of impairments warranted "a reduction to a restricted range of sedentary work," as stated in the

ALJ's RFC finding.  Doc. 10-3 at 54.

The ALJ found that Coley had physical and mental impairments, but that they did "not rise to the level of disability."  Doc. 10-3 at 54–55.  The ALJ found that Coley had cared for herself while her boyfriend worked, performed some household chores, and shopped and attended appointments "despite reported social isolation and anxiety."  Doc. 10-3 at 54.  The ALJ found that Coley's "daily activities cannot be verified with a reasonable degree of certainty," but—even if Coley's limitations were as severe as she alleged—the "relatively weak medical evidence and other factors discussed in the decision" made it "difficult to attribute that degree of limitation to her medical conditions, as opposed to other reasons."  Doc. 10-3 at 54.  The ALJ found that Coley stopped working in 2008, "years before the amended onset date," and that she provided some inconsistent information—including details about her seizure disorder and about her ability to drive.  Doc. 10-3 at 54–55.

The ALJ assigned no weight to the opinion of non-examining physician Dr. Richard Walker because Dr. Walker opined that Coley could perform medium work, which was inconsistent with the record and Coley's obesity.  Doc. 10-3 at 55.  The ALJ assigned limited weight to the opinion of Dr. Samuel Williams, because some of Dr. Williams' opinion was "not phrased in vocationally relevant terms."  Doc. 10-3 at 55.  The ALJ gave limited weight to Dr. Iyer's consultative examination, finding that the assessment was internally inconsistent and did not adequately account for

whether observed limitations were due to back pain or obesity.  Doc. 10-3 at 56.

The ALJ also gave limited weight to the May 2017 opinion of Dr. Nichols because the opinion was vague and did not include determinations of Coley's level of impairment.  Doc. 10-3 at 56.  The ALJ assigned no weight to Dr. Nichols' June 2019 opinion statement.  Doc. 10-3 at 56–57.  After an in-depth discussion of Dr. Nichols' opinion, the ALJ found that it "appears that Dr. Nichols' conclusions may have been generated to produce a specific result," and that Dr. Nichols used "a statement form apparently created by the claimant's attorney, which is a series of questions with mostly 'yes' or 'no' answers."  Doc. 10-3 at 57.  The ALJ found that Dr. Nichols' responses were "conclusory" and had "limited probative value," as the "circled responses provide little narrative and are devoid of insight into the reasons behind the conclusions."  Doc. 10-3 at 57.

Based on the record evidence (at step five), the ALJ found that Coley was capable of performing work consistent with the RFC stated in the decision.  Doc. 10-3 at 57–58.  Based on the vocational expert's testimony, the ALJ found that, considering Coley's age, education, work experience, and RFC, there existed jobs in significant numbers in the national economy that Coley could perform.  Doc. 10-3 at 58–59.  Those jobs included final assembler, folder, and table worker.  Doc. 10-3 at 58.  Accordingly, the ALJ found that Coley had not been disabled under the Social Security Act since March 13, 2017, the date that she filed her application.

Doc. 10-3 at 59.

### 8. Appeals Council decision

Coley requested that the SSA Appeals Council review the ALJ's decision. Doc. 10-3 at 2; Doc. 10-6 at 105. Along with her request, Coley submitted new evidence consisting of medical records from April 22, 2020, through May 1, 2020, which related primarily to pain in Coley's right shoulder, left knee, and back. Doc. 10-3 at 3, 8–37.

On March 23, 2021, the Appeals Council denied Coley's request for review, finding no reason to review the ALJ's decision. Doc. 10-3 at 2. In denying review, the Appeals Council stated that Coley's additional medical evidence did not "show a reasonable probability that it would change the outcome of the decision." Doc. 10-3 at 3. Because the Appeals Council found no reason to review the ALJ's opinion, the ALJ's decision became the final decision of the Commissioner.

## DISCUSSION

Having carefully considered the record and briefing, the court concludes that the ALJ's decision was supported by substantial evidence and based on proper legal standards.

## I. Plaintiff Coley has not identified any reversible error regarding the ALJ's analysis of her obesity under SSR 02-1p or SSR 19-2p.

Plaintiff Coley has not identified any error in the ALJ's analysis of her obesity. In her briefing, Coley argues that the ALJ failed to conduct a proper analysis of her

obesity under SSR 02-1p or its replacement SSR 19-2p because "the ALJ did not explain how plaintiff's gross weight of over 400 pounds would affect her ability to function in a work setting."  Doc. 13 at 35; Doc. 15 at 2–5.

SSR 19-2p provides guidance on establishing that a person has a medically determinable impairment of obesity and evaluating obesity in disability claims.  SSR 19-2p, 2019 WL 2374244 (May 20, 2019).  SSR 19-2p requires that an ALJ consider all evidence from all sources in determining whether obesity is a severe impairment, and that an ALJ "consider the limiting effects of obesity when assessing a person's RFC [residual functional capacity]."  *Id.*

The record contradicts Coley's argument that the ALJ did not consider her obesity under SSR 02-1p or SSR 19-2p.  First, the ALJ found that Coley's obesity qualified as a severe impairment.  Doc. 10-3 at 48.  Further, in determining Coley's RFC, the ALJ specifically stated that Coley "has morbid obesity" with a BMI in the 60s.  Doc. 10-3 at 54.  The ALJ then stated, "in accordance with SSR 19-2p, I have evaluated the claimant's obesity and accompanying impairments in terms of their possible effects on claimant's ability to work."  Doc. 10-3 at 54.  The ALJ found that Coley's obesity, along with her "degenerative disc disease, fibromyalgia, diabetes, and other impairments," combined to "significantly reduce[] [her] ability to perform work activities," such that Coley was restricted to sedentary work.  Doc. 10-3 at 54.  The ALJ also found that the opinions from the non-examining state physician (Dr.

Walker) and from the consultative examiner (Dr. Iyer) did not adequately factor in Coley's obesity and its attending limitations.  Doc. 10-3 at 55–56.

Accordingly, the ALJ did assess Coley's obesity in accordance with SSR 19-2p, and explained how Coley's obesity would affect her ability to work (*see* Doc. 23 at 35); the ALJ found that Coley's obesity was a severe impairment that reduced her ability to work, such that she could only perform sedentary work.

Otherwise, to the extent that Coley might suggest some other error with regard to the ALJ's assessment of her obesity, she has not raised any additional issue for review.[2]  Given that the ALJ assessed Coley's obesity under SSR 19-2p, and reviewing for substantial evidence, the court cannot guess as to what finding Coley hypothetically might suggest was in error, because the court cannot "decide the facts anew, reweigh the evidence," or substitute its own judgment for that of the ALJ. *Winschel*, 631 F.3d at 1178 (quotation marks and citation omitted).

## II. Coley has not identified any reversible error regarding the ALJ's analysis of her fibromyalgia under SSR 12-2p.

Coley has not identified any error in the ALJ's analysis of her fibromyalgia. In her briefing, Coley argues that "the ALJ failed to conduct a Proper Analysis of

---

[2] *See, e.g.*, *Singh v. United States Atty. Gen.*, 561 F.3d 1275, 1278–79 (11th Cir. 2009) ("[S]imply stating that an issue exists, without further argument or discussion, constitutes abandonment of that issue and precludes [this court from] considering the issue on appeal."); *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) (similar).

Plaintiff's Fibromyalgia under SSR 12-2p." Doc. 13 at 2, 38–44; Doc. 15 at 5–6.

In SSR 12-2p, the SSA recognized fibromyalgia as a "basis for a finding of disability." SSR 12-2p, 2012 WL 3017612 (July 25, 2012). That ruling "provides guidance on the evidentiary showing to establish that a claimant has a medically determinable impairment ('MDI') of fibromyalgia and whether that impairment qualifies as disabling under the Social Security Act." *Peterson v. Berryhill*, No. 1:15-CV-751-GMB, 2017 WL 1015316, at *3 (M.D. Ala. March 15, 2017).

But, under SSR 12-2p, if a claimant has a fibromyalgia impairment, "the normal five-step sequential evaluation process is used to determine whether the claimant is disabled." *Id.* And, "[a]s with any claim for benefits," the ALJ "must ensure there is sufficient objective evidence to support a finding that the person's impairment[] so limits the person's functional abilities that it precludes him or her from performing any substantial gainful activity." SSR 12-2p, 2012 WL 3017612 (July 25, 2012).

In this case, the ALJ specifically cited to and applied SSR 12-2p and its criteria for assessing fibromyalgia as a medically determinable impairment. Doc. 10-3 at 52–53. The ALJ found that Coley's medical records showed complaints of widespread pain and "documentation of 10 of the 11 tender points," and consequently found that the evidence was "sufficiently consistent" with the "criteria for fibromyalgia." Doc. 10-3 at 52–53. The ALJ determined that Coley's

28

fibromyalgia qualified as a severe impairment and a medically determinable impairment, and considered it in determining Coley's RFC. Doc. 10-3 at 48, 52–53. Then, consistent with SSR 12-2p (and as explained above), the ALJ applied the sequential five-step test for disability in light of Coley's medically determinable impairments, including fibromyalgia, and found that the evidence showed that she was not disabled. *See* 20 C.F.R. § 416.920(a); *Winschel*, 631 F.3d at 1178; Doc. 10-3 at 52–54. In reaching that finding, the ALJ considered the effects of Coley's fibromyalgia as they combined with her obesity, and stated that Coley's pain and fatigue limited her to sedentary work. Doc. 10-3 at 54.

While SSR 12-2p recognized fibromyalgia as a "basis" for disability benefits, that ruling did not impose a new legal standard that is separate or different from the five-step test for disability that the ALJ applied here. SSR 12-2p, 2012 WL 3017612 (July 25, 2012) (specifically adopting the five-step sequential analysis discussed above). Because the ALJ properly analyzed Coley's claim for benefits based on that five-step test, and included Coley's fibromyalgia in that assessment, Coley has identified no error in the ALJ's analysis under SSR 12-2p.

Again, to the extent that Coley might suggest some other error with regard to the ALJ's analysis of Coley's fibromyalgia under SSR 12-2p, she has not raised any additional issue for review. *See, e.g.*, *Singh*, 561 F.3d at 1278–79; *Sapuppo*, 739 F.3d at 68. Consistent with SSR 12-2p, the ALJ considered Coley's fibromyalgia in

applying the proper five-step legal standard; and, reviewing for substantial evidence, the court cannot guess as to what finding Coley conceivably might suggest was in error regarding the ALJ's consideration of Coley's fibromyalgia, because the court cannot "decide the facts anew, reweigh the evidence," or substitute its own judgment for that of the ALJ. *Winschel*, 631 F.3d at 1178 (quotation marks and citation omitted).

## III.   The ALJ did not err in giving little to no weight to the opinions of Dr. June Nichols.

The ALJ did not err in according little to no weight to the opinions of Dr. June Nichols. In her briefing, Coley argues that the ALJ improperly criticized Dr. Nichols' use of forms and failed to adequately explain the reasoning for the weight given to Dr. Nichols' opinions. Doc. 13 at 44–52; Doc. 15 at 6–9.

With respect to the controlling legal standard, and for a disability application filed before March 27, 2017 (like the application in this case), an ALJ is required to give the opinion of a claimant's treating physician "substantial or considerable weight unless 'good cause' is shown to the contrary." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004) (quotation marks and citation omitted).

There is "good cause" to discount a treating physician's opinion under the following circumstances: (1) the "treating physician's opinion was not bolstered by the evidence"; (2) the "evidence supported a contrary finding"; or (3) the "treating physician's opinion was conclusory or inconsistent with the doctor's own medical

30

records." *Winschel*, 631 F.3d at 1179 (quotation marks omitted).[3]

Likewise, under the Social Security regulation for a disability application filed before March 27, 2017, if "a treating source's medical opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," then that opinion "will [be given] controlling weight." 20 C.F.R. § 416.927(c)(2).

Furthermore, a "statement by a medical source that [the claimant is] 'disabled' or 'unable to work' does not mean that [the SSA] will determine" that the claimant is "disabled." 20 C.F.R. § 404.1527(d)(1). That is because opinions about whether a claimant is disabled, the claimant's "residual functional capacity" (RFC), and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Any such statement from a treating physician may be relevant

---

[3] Revised Social Security regulations—which were published on January 18, 2017, and which became effective on March 27, 2017—eliminated this so-called "treating physician rule." *See* 20 C.F.R. §§ 404.1520c, 416.920c (2017) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources."); *Harner v. Social Sec. Admin., Comm'r*, 38 F.4th 892, 897–98 (11th Cir. 2022) (holding that 20 C.F.R. § 404.1520c, which prohibits deferring to any medical opinions, applies to claims filed after March 27, 2017, and eliminates the treating physician rule). But, because Coley filed her application on March 13, 2017 (i.e., before the effective date of those new regulations), the court applies the Eleventh Circuit's treating physician rule. *See* Doc. 10-5 at 40.

to the ALJ's findings but is not determinative, because it is the ALJ who must assess the claimant's residual functional capacity.  *See, e.g.*, 20 C.F.R. § 404.1546(c).  And the court analyzes only whether the ALJ's RFC determination was supported by substantial evidence; the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner."  *Dyer*, 395 F.3d at 1210.

In this case, the ALJ gave limited weight to Dr. Nichols' May 2017 opinion. The ALJ found that Dr. Nichols' opinion was couched in vague terms and did not include specific determinations of Coley's level of impairment.  Doc. 10-3 at 56. The ALJ noted that Dr. Nichols did not use the terms "mild, moderate, or marked" to describe Coley's impairments, but used words like "impaired" and "interfere." Doc. 10-3 at 56.  In addition, the ALJ assigned no weight to Dr. Nichols' June 2019 examination and opinion statement.  Doc. 10-3 at 56–57.  The ALJ found numerous inconsistencies in Dr. Nichols' examination and opinion, and found that the opinion was conclusory and had limited probative value.  Doc. 10-3 at 56–57.

Substantial evidence supports the ALJ's decision to give little to no weight to the opinions and evidence submitted by Dr. Nichols.  First, the ALJ concluded that Dr. Nichols' language was vague.  Doc. 10-3 at 56.  The record shows that Dr. Nichols' opinions and examinations addressed impairments and interference without quantifying degree, and that Dr. Nichols' June 2019 opinion consisted of circled responses with no explanation for why Dr. Nichols reached her conclusions.  Doc.

10-11 at 3–6; Doc. 10-16 at 8.  While Coley argues that the ALJ improperly took issue with the fact that Dr. Nichols used a form (Doc. 13 at 47–48), the record instead shows that the ALJ took issue with the lack of "narrative" and "insight" to support Dr. Nichols' conclusions.  Doc. 10-3 at 57.  The ALJ found that it "appears that Dr. Nichols' conclusions may have been generated to produce a specific result," and that Dr. Nichols used "a statement form apparently created by the claimant's attorney, which is a series of questions with mostly 'yes' or 'no' answers."  Doc. 10-3 at 57.  Thus, the ALJ found that Dr. Nichols' opinions were conclusory and seemingly targeted in nature, and there was "good cause" to give those opinions limited or no weight.  *See Winschel*, 631 F.3d at 1179.

The ALJ also identified numerous inconsistencies between Dr. Nichols' opinions and her own records, and those inconsistencies likewise show "good cause" to give limited or no weight to the opinions.  Doc. 10-13 at 56–57; *see Winschel*, 631 F.3d at 1179; 20 C.F.R. § 416.927(c)(2).  The ALJ found that Dr. Nichols opined that Coley would likely be unable to maintain attention and pace for at least two hours, but during the examination Coley performed multiple focus-based tasks, had no memory issues, had an adequate knowledge fund, described her participation in activities requiring focus, and did not need to be redirected.  Doc. 10-3 at 56–57.  The ALJ also found that Dr. Nichols opined that Coley was unlikely to be able to maintain a regular work schedule, but Coley arrived on time to the examination.

Doc. 10-3 at 57.  The ALJ found that Dr. Nichols opined that Coley would be absent one or two days a month, but only due to unspecified "issues."  Doc. 10-3 at 57.

The ALJ also found that Dr. Nichols opined that Coley could not maintain an ordinary work routine without supervision, but stated that Coley had indicated that, when she was at home all day, she could make lunch and play games on her phone, and attended appointments without accompaniment.  Doc. 10-3 at 57.  The ALJ found that there was no strong basis for Dr. Nichols' opinion that Coley could not seek and accept appropriate instructions and criticism from supervisors, and that Dr. Nichols' opinion that Coley could not maintain socially appropriate appearance and behavior was based only on Coley's self-reports and her having looked "slightly disheveled."  Doc. 10-3 at 57.  The ALJ also found that Coley's ability to manage financial interests was inconsistent with the level of limitation Dr. Nichols suggested, especially where Dr. Nichols' "conclusions suggest an individual who is unable to function outside a structured environment, yet the claimant is in fact living in the community and is maintaining a home and a relationship."  Doc. 10-3 at 57.  The ALJ also found that Dr. Nichols' 2017 report was "not so dire" as her 2019 opinion.  Doc. 10-3 at 57.

Further, Dr. Nichols' opinions are inconsistent with other evidence in the record, which supports "good cause" to give limited or no weight to the opinions.  *See Winschel*, 631 F.3d at 1179; 20 C.F.R. § 416.927(c)(2).  Coley's own testimony

on multiple occasions indicated that she was capable of performing household tasks requiring focus and attention, including watching television, playing games on her phone, and preparing and cooking dinner.  Doc. 10-9 at 28–31; Doc. 10-4 at 54–55; Doc. 10-16 at 5.  Additionally, despite saying that leaving the house caused her panic attacks, Coley testified that she shopped (Doc. 10-9 at 31), and the record shows that she attended various appointments.  *See generally* Doc. 10-11; Doc. 10-12; Doc. 10-13; Doc. 10-14; Doc. 10-15; Doc. 10-16.

Thus, the ALJ's analysis shows that the ALJ decided to give little to no weight to Dr. Nichols' opinions because those opinions contained multiple conclusory, unsupported, and inconsistent findings about Coley's limitations.  Dr. Nichols' findings about Coley's abilities to function did not match her own observations of Coley's behavior, or other evidence in the record, and there was "good cause" to discount Dr. Nichols' opinions.  *See Winschel*, 631 F.3d at 1179.  Accordingly, substantial evidence supports the ALJ's decision to give little to no weight to Dr. Nichols' opinions.

## IV.    The ALJ properly posed hypothetical questions to the vocational expert such that the ALJ's decision was based on substantial evidence.

The ALJ posed proper hypothetical questions to the VE such that the ALJ's decision was based on substantial evidence.  In her briefing, Coley argues that the ALJ's decision was not based on substantial evidence because the ALJ disregarded Dr. Nichols' opinions, failed to properly assess Coley's obesity and fibromyalgia,

and "relied on Vocational Expert testimony that was not based on a correct or full statement of claimant's limitations and impairments."  Doc. 13 at 52; Doc. 15 at 9–10.  Coley argues that "the testimony of the [vocational expert] was not substantial evidence of ability to work because the hypothetical question relied upon did not accurately state claimant's weight, her pain level, her fibromyalgia, or her residual functional capacity."  Doc. 13 at 52.

As a preliminary matter (and as explained above, *see supra* Parts I, II, and III), Coley has not identified any error with regard to the ALJ's analysis of Dr. Nichols' opinions, Coley's obesity, or her fibromyalgia.  Likewise, Coley cannot show that the ALJ erred in posing hypotheticals to the vocational expert or in relying on the VE testimony.

"[F]or a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments."  *Winschel*, 631 F.3d at 1180.  But, if substantial evidence supports the ALJ's finding that the claimant does not have a particular limitation, the ALJ need not include that limitation in a hypothetical question to the vocational expert.  *Crawford*, 363 F.3d at 1161.

In this case, the ALJ posed hypothetical questions to the vocational expert— consistent with the ALJ's RFC determination—about an individual who could perform work at the sedentary exertional level with additional limitations including

only occasionally climbing ramps and stairs or stooping and crouching, never climbing ladders, ropes, or scaffolds, never kneeling or crawling, occasionally reaching overhead with the right extremity, understanding, remembering and carrying out simple instructions and tasks, tolerating changes only infrequently and when gradually introduced, and only having occasional interaction with people. Doc. 10-4 at 101.  The ALJ also included in the hypothetical questioning the individual's need to alternate between sitting and standing every 45 minutes.  Doc. 10-4 at 102.

As noted above, the hypothetical limitations that the ALJ posed to the vocational expert accurately reflect the ALJ's determination of Coley's RFC (*see* Doc. 10-3 at 51), which included consideration of Coley's obesity and fibromyalgia. Consequently, the ALJ did not have to ask the vocational expert about any limitation that the ALJ had not found in the RFC determination—e.g., any other limitation that Coley had alleged, or that Dr. Nichols had included in her opinions (as to which there was "good cause" for the ALJ to discount), but that were not included in the ALJ's RFC determination.  *See Crawford*, 363 F.3d at 1161.  Thus, the ALJ properly relied on the VE's testimony to find that jobs existed that Coley could perform, and that Coley was not disabled.

In the end, "[b]ased on the testimony of the vocational expert," the ALJ found that, "considering [Coley's] age, education, work experience, and residual functional

capacity, [she] is capable of making a successful adjustment to other work that exists in significant numbers in the national economy."  Doc. 10-3 at 59.  Substantial evidence supported the ALJ's reliance on the vocational expert's testimony, and the ALJ's finding that Coley was not disabled under the Social Security Act.

## CONCLUSION

For the reasons stated above (and pursuant to 42 U.S.C. § 405(g)), the court **AFFIRMS** the Commissioner's decision.  The court separately will enter final judgment.

**DONE** and **ORDERED** this September 19, 2022.

_____
**NICHOLAS A. DANELLA**
UNITED STATES MAGISTRATE JUDGE